JAMES IRVINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 104587.    Promulgated February 4, 1942.

*Arthur H. Kent, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

OPINION.

*Trust Income Issue.*

KERN: The first issue for our consideration is whether the amount of $18,000 representing income of an antenuptial trust set up by petitioner for his second wife, which amount was paid to her by the trustee in the taxable year, is properly includible in petitioner's taxable income.

Respondent argues, first, that the income is taxable to the petitioner under the provisions of section 167 of the Revenue Act of 1936.[2] Our findings of fact, *supra*, disclose that, although the petitioner did possess during the taxable year the power to revoke, alter, amend, or modify the trust agreement, nevertheless, this power was effective only if the wife, the sole beneficiary of the trust, joined with petitioner in the exercise of the power. We are not concerned with any income in excess of $18,000 which may have been earned by the trust corpus in the taxable year, but merely with the $18,000 which the instrument made subject to the wife's demand and which she, in fact, received during the taxable year. If section 167 is applicable, then it must be held that the $18,000, or some part of it, could have been distributed to or was held or accumulated for future distribution to the petitioner in the discretion of petitioner alone, or in conjunction with a person not having a substantial adverse interest. That petitioner alone could not revoke or amend the instrument we have found as a fact. The question, then, narrows down to whether the wife had a substantial adverse interest. If so, then section 167 is inapplicable, since her consent was necessary to any modification, alteration, or revocation of the instrument, without which none of the $18,000 could have been either distributed to or held for the petitioner. It is difficult to conceive how the wife's

---

[2] SEC. 167. INCOME FOR BENEFIT OF GRANTOR.

    (a) Where any part of the income of a trust—

        (1) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, held or accumulated for future distribution to the grantor; or

        (2) may, in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor; or

        (3) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, applied to the payment of premiums upon policies of insurance on the life of the grantor (except * * *);

then such part of the income of the trust shall be included in computing the net income of the grantor.

    (b) As used in this section, the term "in the discretion of the grantor" means "in the discretion of the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of the part of the income in question."

interest under the trust could be considered as not being a substantially adverse one. She relinquished all of her community rights as part of the *quid pro quo* for the execution of the trust instrument. If she consented to receive less in any year than the $18,000 made subject to her command by the instrument, she would be cutting off her principal source of income. It is possible to visualize a situation where a wife might be willing to turn over her life interest in a trust to her husband because she knows that under state law governing maintenance and support and dower rights she will have equivalent or greater rights enforceable against her husband and his property. Here, however, the trust instrument together with the agreement between petitioner and his wife, specifically provided that the trust income was to be in addition to necessary support, except for clothes allowance and pin money, and by the same instrument the wife relinquished her community property rights. Clearly, here the wife had an adverse interest. Consequently, section 167 is inapplicable. See *Jane B. Shiverick*, 37 B. T. A. 454, and cases therein cited; *Commissioner* v. *Betts*, 123 Fed. (2d) 534.

We are aware that in *Altmaier* v. *Commissioner*, 116 Fed. (2d) 162, the Circuit Court of Appeals for the Sixth Circuit held that under the facts presented therein the wife of the settlor was not a person having a substantial adverse interest. The court, in reaching this conclusion, relied upon the doctrine of "the normal consequences of family solidarity" which the court felt was the basis of the decision in *Helvering* v. *Clifford*, 309 U. S. 331, which we discuss at greater length *infra*.[3] The facts in that case, however, differed substantially from those present here. There the husband and wife had been married for some time prior to the creation of the trusts involved and three children had been born to the union. The picture there presented was one of "family solidarity." In the instant proceeding the trust was created before the marriage of the parties and as part of an antenuptial agreement entered into by a widow and widower of mature age, each of whom had a child or children by a former marriage. It can not be said with any sense of realism that there was such a family solidarity existing between the parties to this contract at the time it was executed and prior to their marriage as to have as one of its normal consequences at that time a unity of economic interests resulting in the beneficiary's interests being identical rather than adverse to those of the settlor.

---

[3] It is interesting to note that the Congress, in considering the Revenue Act of 1941, did not require the filing of a joint return by husband and wife and thus recognized, by legislation, such a doctrine of "family solidarity." We do not discuss the imputation implicit in any holding that a wife is not a person having an interest substantially adverse to her husband, to the effect that by reason of economic subserviency or other considerations a married woman does not have full legal independence.

Respondent's next argument is that the provisions of section 166 of the Revenue Act of 1936 [4] cover the situation. For the reasons set out above, however, we judge this section to be inapplicable, also. The first supplementary agreement did give to the petitioner the option of revoking the supplementary agreement which, by its terms, added certain securities to the corpus of the trust. But this option was exercisable only if the Commissioner's office asserted that the whole or any part of the addition to corpus was subject to the Federal gift tax. Thus there was a condition precedent to exercise of the option, a condition over which petitioner had no control. Since the Commissioner's office did not assert a gift tax liability until after the taxable year, this option was never exercisable within the taxable year. And, as to the rest of the trust corpus, the consent of the wife was necessary to any revocation.

The next argument of respondent is based upon the *rationale* of *Helvering* v. *Clifford, supra,* and cases thereunder. As we have already indicated, we do not consider that doctrine herein applicable because of the great variance of the factual situation. Here the trust was not set up as a method of tax evasion. It is not a short term trust; nor is it gratuitous. The wife-to-be renounced her community interest by acceptance of the provisions of the trust. The petitioner, as settlor, although he could direct reinvestments and could, with his wife's consent, substitute trustees, did not have at his command the use of the trust corpus. And this was not a "temporary reallocation of income within an intimate family group." At the time this trust was created there was as yet no such "intimate family group" and the facts disclose that one of the reasons for setting up this trust was the fear that the subsequent family relations might not be intimate. It is apparent that the petitioner did not intend this diversion of income to be temporary; everything about the preliminary negotiations and the agreement itself points to permanency. The trust was created prior to marriage and was to last until the marriage was dissolved by death.

The fourth argument of respondent is that the trust income here in controversy was used to pay a legal obligation of the petitioner and is, therefore, taxable in its entirety to petitioner under the rule of *Douglas* v. *Willcuts,* 296 U. S. 1. Neither that case nor any cases

---

[4] SEC. 166. REVOCABLE TRUSTS.

Where at any time the power to revest in the grantor title to any part of the corpus of the trust is vested—

> (1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, or
>
> (2) in any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom,

then the income of such part of the trust shall be included in computing the net income of the grantor.

subsequently decided on the same basis covers this situation, however, in the manner urged by respondent. In most of that line of cases the settlors created the trusts to completely discharge continuing personal legal obligations to support, and the divorce courts approved and confirmed the trusts in their decree on that basis, subject to powers of modification. Here the petitioner's legal obligation to support his wife was not discharged by the execution of the trust, nor was it attempted to be. The trust instrument specifically points this out. As originally written there was, indeed, a self imposed and continuing personal obligation to see that petitioner's wife received $1,500 monthly for clothes, pin money, and the like. But the first supplemental agreement of 1935 put an end to petitioner's personal obligation on this score by the addition to corpus and the specific provision that the wife accepted the addition in full discharge of the promises and obligations of the petitioner in the antenuptial agreement with respect to monthly payments. Thus, the rule of *Helvering* v. *Leonard*, 310 U. S. 80, is not applicable.

The mere fact that the preamble to the antenuptial agreement states that "it has been deemed by each fair, just, equitable and adequate to make the provisions hereinafter set forth for the support and maintenance of the party of the second part" does not *ipso facto* make the trust a maintenance trust. This was pointed out by the Board in *Herbert G. Goulder*, 39 B. T. A. 670; reversed on another point, 123 Fed. (2d) 686. See *Fidelity Union Trust Co.* v. *Kelly*, 102 Fed. (2d) 333. Any ambiguity on this score is adequately cleared up by the later provisions of the agreement. Nor can it be concluded, as respondent urges, that the terms of the agreement restricted the wife's application of the income to such an extent that petitioner is taxable thereon. The agreement states it is to be "for her sole and individual use as she may see fit, without the necessity of accounting therefor to anyone, said sum to cover her requirements for pin money and the like, including her personal expenses for clothing and the like, but not including * * *."

The 1931 antenuptial agreement could not and did not change the subsequent marital status of petitioner and his present wife, although it could and did maintain the status of petitioner's future earnings as separate property instead of community. *Van Dyke* v. *Commissioner*, 120 Fed. (2d) 945.

Petitioner has submitted in evidence a showing of the wife's use of this money in the taxable year. With the exception of the expenditures for clothing, perfume, and jewelry, and those denominated "miscellaneous", there are no expenditures therein which could normally be considered within the scope of support due a wife from her husband. Most of the income of the trust was spent by the

beneficiary on her son by a prior marriage, for whose support petitioner was under no obligation.

Petitioner concedes that the continuing obligation to support a wife, arising by operation of law as an incident to the marital status, could not be discharged under California law by an *inter vivos* agreement. Civil Code of California, secs. 174, 175. Petitioner submits that the measure of petitioner's liability herein is the amount of trust income actually applied by the wife for purposes which fall within the scope of petitioner's continuing marital obligation of support, citing *Hudson* v. *Jones*, 22 Fed. Supp. 938; *M. F. Tiernan, Trustee*, 37 B. T. A. 1048; *Meredith Wood*, 37 B. T. A. 1065; and *Ingraham* v. *Commissioner*, 119 Fed. (2d) 223.

Since there is an express provision in the trust deed requiring the beneficiary to apply part of the income of the trust to the satisfaction of an obligation of the settlor, that part of the income of the trust which is applied to such a purpose is taxable to the settlor. In view of the respondent's determination herein, the burden of showing what part of the trust income was not so applied is upon petitioner. *Commissioner* v. *Grosvenor*, 85 Fed. (2d) 2; *Stuart* v. *Commissioner*, 124 Fed. (2d) 772. To the extent that the wife spent the trust income for clothing and other personal items ($4,807.98) and for perfume and jewelry ($439.46), the husband's duty to supply money for these items was lessened. The agreement specifically provided that the wife should buy these things out of trust income, and it may, therefore, be concluded that the trust was an attempt to relieve petitioner of his legal obligation to this extent. There may be some difference of opinion as to whether perfume and jewelry are such necessary items as to be included within the scope of "support and maintenance." Considering the means and the station in life of the parties hereto, we feel justified by custom and social usage to consider these items, under the facts of this case, to be "necessaries." To the extent that the trust income was used for these purposes, the petitioner is taxable for the income of the trust. The item of expenditure denominated "miscellaneous" was not fully explained by petitioner's witness, an accountant. He testified that to the best of his knowledge it did not include sums relating to the beneficiary's personal apparel, but that it included "a number of checks to 'cash', which may or may not have been spent for apparel." We can not conclude on the record that this item did not include sums spent in satisfaction of petitioner's legal obligations, and, therefore, the amount thereof ($870.19) should also be taxable to petitioner. Since there is no showing that any of the $5,000 gift made by petitioner to his wife in the taxable year actually went for this purpose, we, therefore, must consider that these expenditures were made wholly from trust income.

*Charitable Contribution Issue.*

The deduction of $3,300 here claimed was disallowed because the contribution was deemed by the Commissioner not to have been made to the type or class of organization specifically referred to in section 23 (o) of the Revenue Act of 1936. To meet the test provided by that section, it must appear that:

(a) The donee is a corporation, or trust, or community chest, fund or foundation;

(b) The donee was organized exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals;

(c) The donee is operated exclusively for the purposes set forth in (b) supra;

(d) No part of the net earnings of donee inures to the benefit of any private shareholder or individual; and

(e) No substantial part of the donee's activities is carrying on propaganda, or otherwise attempting to influence legislation.

Unless all of the conditions set forth above can be met by the donee, taxpayers may not deduct contributions made thereto from gross income pursuant to section 23 (o) (2).

The crucial question of this issue is whether the Society of California Pioneers meets requirements (b) and (c) of the test set forth above, or, in other words, whether it was "organized exclusively for * * * charitable, scientific, literary, or educational purposes" and was operated exclusively for such purposes.

Respondent contends that the society can not meet these requirements because of its social aspects and relies upon the fact that one of the purposes expressed in its certificate of incorporation and constitution was "to cultivate social intercourse and form a more perfect union among its members", and also upon the fact that section 23 of the bylaws of the society, as revised January 1, 1926, makes reference to card playing, a billiard room, a card room, and the issuance of visitors' cards.

Testimony on this issue was given by two witnesses—the petitioner and the secretary of the society. The secretary testified that the main purpose of the society was "to gather and collect material pertaining to the history of California. That means maps and books and pictures and prints and diaries and memoirs and everything pertaining under the general head of Californiani." These were housed in the library and gallery of the society, which were always open free to the public. She further testified that the society had no social activities other than monthly meetings of the directors and an annual meeting of the members, who also met at other times at the call of the directors. These were "short meetings, usually to hear reports of members of committees and the directors and to have ordinarily one

short talk from some member, usually on some subject pertaining to California history." She further testified that no portion of the funds of the society were spent for social activities. There was no cross-examination of this witness.

The petitioner testified that he had been a member of the society for 50 years, that the meetings were such as described by the secretary, and that there had not been any social activities in connection with the meetings. He was not cross-examined upon this issue.

In *George E. Turnure*, 9 B. T. A. 871, 874, we said:

> Practically all religious and educational associations and some charitable organizations make use of social or athletic features, but only as means to an end. Unless the social feature predominates such organizations are none the less exclusively religious, educational or charitable. The general or predominant purpose is principally to be considered.

In that case it was held that the social aspects did not predominate in the organization in question. In the case of *Alfred T. Davison*, 21 B. T. A. 251, it was held that, where members of a college fraternity were also members of a literary society which maintained a hall for literary exercises connected with the dwelling house of the fraternity, the literary society was predominated by the social aspects of the fraternity and therefore the rule in the *Turnure* case did not apply.

On the record presented in this proceeding we are of the opinion that the social aspects of the society were incidental and subordinate to the predominant scientific, literary, and educational purposes of the organization, i. e., the collection and exhibition of material having to do with the early history of the State of California and research in that history by members of the society. Therefore, on the authority of *George E. Turnure, supra*, we decide this issue in favor of petitioner.

### Stock Redemption Issue.

Respondent argues that the gain of $4,253.97 realized on the redemption of petitioner's stock by the Tidewater Associated Oil Co. is taxable under section 115 (c) of the Revenue Act of 1936 as a gain realized on partial liquidation. Petitioner, on the other hand, asserts that it is a gain on the sale or exchange of a capital asset, subject to the provisions of section 117 of the same act.

The crucial question to be considered is whether the stock of petitioner was retired and completely canceled. If so, there was a statutory partial liquidation, as that term is defined in section 115 (i),[5] for purposes of the application of section 115 (c). All the

---

[5] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

    \*        \*        \*        \*        \*        \*        \*

    (i) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, \* \* \*

preferred stock in the instant proceeding was either received by the company pursuant to the exchange offer or the later redemption. And it was specifically provided that this stock was not subject to reissue. These being the material facts, we must decide the issue in favor of respondent. *Amelia Cohen Trust* v. *Commissioner*, 121 Fed. (2d) 689; *Benjamin R. Britt*, 40 B. T. A. 790; *Salt Lake Hardware Co.*, 27 B. T. A., 482.

Petitioner argues that a distinction should be drawn between a situation wherein a certain class of stock is retired and no further stock issued in its place, and the instant situation where the retirement of all the 6 percent preferred stock was an integral part of a refinancing plan which actually contemplated and resulted in a substantial expansion of the company's capital. We do not believe a valid distinction on these lines can be made for the present purposes. *L. B. Coley*, 45 B. T. A. 405.

### Community Property Issue.

It is undisputed that the antenuptial agreement entered into in 1931 is binding on the parties. By this agreement the status of any future salaries earned by the petitioner was, in advance, decided by the parties to be the separate property of petitioner, free from any claim thereto as community income which might otherwise be made by the wife-to-be. Such agreements are recognized as valid and binding by the California courts. *Wren* v. *Wren*, 100 Cal. 276; and, accordingly, it is obvious that salary earned subsequent to the antenuptional agreement is petitioner's separate property and therefore is taxable to him alone. *W. S. Van Dyke, supra; Helvering* v. *Hickman*, 70 Fed. (2d) 985. We, accordingly, affirm the Commissioner's determination on this issue.

*Decision will be entered under Rule 50.*